## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CHRISTOPHER DESA,

　　　　　　　　Petitioner,

v.

PATRICK NOGAN, et al.,

　　　　　　　　Respondents.

Civil Action No. 21-7444 (SDW)

OPINION

**WIGENTON**, District Judge:

Presently before the Court is the amended petition for a writ of habeas corpus of Petitioner Christopher Desa (ECF No. 5) brought pursuant to 28 U.S.C. § 2254.  Following this Court's Order to Answer, the State filed a response to the petition.  (ECF No. 10).  Petitioner did not file a reply.  Also before the Court is Petitioner's motion seeking the appointment of counsel.  (ECF No. 12).  For the following reasons, Petitioner's habeas petition is denied, Petitioner is denied a certificate of appealability, and Petitioner's motion is denied.

## I.  BACKGROUND

In its opinion affirming Petitioner's conviction, the Superior Court of New Jersey – Appellate Division provided the following summary of the factual basis of this matter:

> At approximately 9:30 a.m. on October 6, 2012, Yazmine Jimenez and her husband Christian were working in a deli that was owned by Yazmine's[] parents.  A man entered the store wearing a black hoodie and dark blue jeans.  The man's face was not covered.  Yazmine, who was working behind the counter, later identified the man as [Petitioner].
>
> 　　Defendant pretended he was going to make a purchase, but then took out a black gun and demanded money.  Yazmine opened

1

the cash drawer where lottery proceeds were kept, and [Petitioner] grabbed between $300 and $350. [Petitioner] then ran out of the store. As soon as [Petitioner] left, Yazmine told Christian that she had been robbed, and Christian ran out of the store looking for [Petitioner].

When he got outside, Christian saw a man running away and chased him. As Christian closed in, the man looked over his shoulder and said, "I'm going to shoot you bitch. Stop following me." Christian stopped pursuing the man for a few moments, and then turned down a driveway to look for him. Christian heard tires screeching and saw a man wearing a black hoodie drive a Jeep out of a driveway near a doctor's office. Christian wrote down the car's license number on his arm and ran back to the deli.

By that time, Yazmine was on the telephone with the police and she and Christian described the man and reported the car's license number to the dispatch officer, who broadcasted the information to available police units. One of the officers who heard the dispatch, Detective Dan Kapsch, recognized the license plate number of the suspect's Jeep as belonging to Gemma Bumback, his father's former girlfriend. The detective knew that Bumback and [Petitioner] were friends and that Bumback allowed [Petitioner] to drive her Jeep. Based on this information, the officers located a photograph of [Petitioner], which Yazmine identified as the man who robbed her.

After [Petitioner] was identified, the police were able to monitor his cellphone pings, which showed that [Petitioner] was at a motel. Several officers responded to that location. Suddenly, an officer saw the Jeep pull out of a parking spot, and alerted the other officers, who began yelling at [Petitioner] to stop, show his hands, and get out of the car. [Petitioner] then crashed the Jeep into a police car, and momentarily stopped. Detective Todd Ritter ran to the car and began hitting the window with his gun in an attempt to break it. As he did so, the detective saw that [Petitioner] had a black handgun on his lap. Detective Ritter shot several rounds into the car while yelling at [Petitioner] to get out of the car. The officer believed that some of the shots hit [Petitioner]. However, [Petitioner] drove away, striking Officer Ritter with the car and running over his foot.

[Petitioner] immediately hit the concrete median on the highway and some street signs, but he kept going. A New Jersey Transit police officer saw [Petitioner]'s car driving erratically and activated his overhead lights, signaling [Petitioner] to pull over. [Petitioner] failed to do so, and the officer pursued him through a

number of red lights at speeds up to ninety miles an hour. Other officers joined in the pursuit. [Petitioner] still would not stop and he hit approximately twelve other vehicles as he drove. After about two miles, [Petitioner] crashed into another car, causing injuries to the occupants, Ronald and Carol Cooper.

Finally, [Petitioner] drove his car head-on into a pole. The officers ran to the car and saw that [Petitioner] had sustained several gunshot wounds. The officers removed [Petitioner] from the Jeep, handcuffed him, and called for medical assistance. [Petitioner] told the police that he had thrown the gun out of the car window during the chase. A number of private citizens soon reported that there was a gun in the right-hand lane of the highway. An officer retrieved the gun, which Detective Ritter later identified as the same one he saw on [Petitioner]'s lap in the motel parking lot.

At trial, a witness who worked at the doctor's office near the deli testified that she saw a man wearing a hooded jacket and dark pants park a Jeep in the nearby parking lot. A few minutes later, she observed the same man running back to the Jeep from the direction of the deli. The man appeared to be upset and he drove away at a high rate of speed.

Before they located [Petitioner] at the motel, the police contacted [Petitioner]'s girlfriend, Cynthia Guzman, to determine if she knew where he was. Guzman called [Petitioner] and told him the police were searching for him. [Petitioner] told Guzman that he was not where the police thought he was and that he did not have Bumback's car.

Bumback testified that she and [Petitioner] stayed together at a motel on October 15, the night before the robbery. Bumback stated that she was intoxicated and fell asleep as soon as she and [Petitioner] checked into the motel. The next morning, [Petitioner] woke Bumback up around check-out time. Bumback testified that [Petitioner] was in a "panic" because he said he had a fight with his girlfriend. [Petitioner] told Bumback that they had to leave the motel right away because he was afraid his girlfriend would call the police on him.

[Petitioner] and Bumback then checked out, got something to eat, bought some liquor and beer, and checked into a different motel, which was the one where the police chase began. Bumback stated that [Petitioner] kept looking out of the window of the motel room. [Petitioner] told Bumback that he was going to get something

from the car, and he went outside.  Bumback then heard screeching tires and gun shots.

[Petitioner] testified on his own behalf.  According to [Petitioner], he used Bumback's car on October 16, 2015[,] without her permission to drive to the parking lot near the deli so he could purchase some marijuana from a dealer he knew was in the area.  He stated he took a starter pistol with him because he had been robbed in the past while buying drugs.

After [Petitioner] completed the transaction, he heard someone screaming.  Fearful that he would be caught with the marijuana, [Petitioner] got into the Jeep and "peeled out" of the parking lot.  As [Petitioner] was driving back to the motel, Guzman called him and [Petitioner] told her that they needed to break up.  In response, [Petitioner] claimed that Guzman stated that the police were looking for him in connection with a robbery.  [Petitioner] testified that he thought Guzman was trying to trick him into coming to see her, so he hung up the phone.  [Petitioner] then drove to his house and picked up approximately $200.

[Petitioner] returned to the motel room where Bumback was still sleeping, [woke] her up, and told her they had to leave because Guzman might come looking for him.  After buying food and liquor along the way, [Petitioner] and Bumback checked into the second motel, where they stayed until [Petitioner] decided they needed to get more vodka.  [Petitioner] stated that he got in Bumback's car and turned on the music, so he never heard any of the police officers yelling at him.  Suddenly, someone smashed the car window.  [Petitioner] testified that he believed he was about to be robbed, so he drove off.  As [Petitioner] did so, he was shot several times.

As he drove wildly down the highway, [Petitioner] claimed that he still did not realize that the men in the cars pursuing him were police officers.  He admitted that he threw his starter pistol away as he drove.  [Petitioner] denied robbing the deli or telling Christian to stop following him or he would shoot him.

(Document 3 attached to ECF No. 10 at 1-3).  Following trial, Petitioner was convicted of robbery, theft by unlawful taking, eluding a law enforcement officer, resisting arrest, aggravated assault, criminal mischief, and unlawful possession of an imitation firearm.  (*Id.* at 1).

4

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 567 U.S. 37, 40-41 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts,

"a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

## B.  Analysis

In his amended petition, Petitioner raises four claims in which he asserts that he received ineffective assistance of counsel.  The standard applicable to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forh in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).  To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.  This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).  To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).  A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.*  The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.*  In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93.  "It is not enough for the defendant to show

that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.  The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299.  Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief.  *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010).  "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims.  *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

In his first claim, Petitioner contends that his counsel proved ineffective at trial because he had a conflict of interest arising out of an alleged contingency fee arrangement to represent Petitioner in violation of state ethics rules, and refused to expend money on Petitioner's defense at trial.  In affirming the denial of Petitioner's PCR petition, the Appellate Division provided the following context to this claim based on the PCR record:

[Petitioner's] attorney agreed to represent [Petitioner] in two separate criminal matters in Somerset and Middlesex Counties, including the present case.  In return, [Petitioner] agreed to pay his attorney $100,000.  However, the parties' agreement specifically stated that "it is anticipated that the [money] will be paid out of any settlement proceeds recovered in" a civil matter [Petitioner] had filed against Piscataway Township, the Piscataway Police Department, and a police officer for injuries he sustained when the officer shot [Petitioner] as he began to elude the law enforcement officers who were trying to apprehend him.  In other words, [Petitioner]'s attorney, who was representing him in the civil action, assumed the risk that he might never be paid for representing [Petitioner] in the criminal matter.  Thus, payment was not contingent on whether defense counsel was successful at [Petitioner]'s trial on the charges involved in this case.

(Document 5 attached to ECF No. 11 at 4).

Based upon this background, the state courts concluded that counsel did not engage in an inappropriate contingency fee arrangement in Petitioner's criminal matter.  (*Id.* at 4, 11).  As Petitioner failed to show an actual conflict of interest or an inappropriate fee arrangement, and as Petitioner otherwise failed to show any prejudice he suffered as a result of counsel's actions, the state courts rejected Petitioner's claim.  (*Id.*).  Having reviewed the record of this matter, it is clear that Petitioner is mistaken to the extent he contends counsel engaged in an improper contingency fee arrangement – as noted by the state courts, counsel agreed to represent Petitioner for a set fee, that counsel may never recover that money absent a positive settlement in Petitioner's civil suit does not change that fact.  Ultimately, however, Petitioner has utterly failed to show that he was prejudiced as a result of counsel's representation – he points to no actual incidents of prejudice suffered as a result, instead relying only on bald assertions that counsel "didn't invest" in his defense – notwithstanding counsel's investment of time and attention at, before, and after trial.  As Petitioner has failed in any non-conclusory way to address the prejudice prong, he fails to show ineffective assistance of counsel, and his first claim is without merit.  *Palmer*, 592 F.3d at 395.

In his second claim, Petitioner contends that counsel proved ineffective in failing to instruct him "not to plead guilty in another matter in which [he] was represented by a different attorney," resulting in Petitioner receiving only gap credits in place of jail credits.  (ECF No. 5 at 7).  The state courts rejected this contention, noting that Petitioner "was represented by a different attorney in connection with [the other] charges," and there was "nothing in the record to indicate that [Petitioner's] attorney in this case was responsible in any way for [his] decision to plead guilty to those charges in advance of his trial in the present matter."  (Document 5 attached to ECF No. 11 at 5, 11).  The state courts further rejected Petitioner's claims as he "received all of the jail and

gap-time credits due to him at the time of sentencing in both matters." (*Id.* at 5). As Petitioner's trial attorney in this matter was not responsible for representing Petitioner in the matter in which he pled guilty, trial counsel in this matter owed Petitioner no duty to advise him how or when to plead guilty in that matter, and bears no responsibility for Petitioner's decision to plead guilty in a case in which Petitioner had an entirely separate attorney. Petitioner has therefore failed to show that counsel was deficient in not advising him as to a completely separate case in which Petitioner was represented by another attorney, and this claim of ineffective assistance of counsel is utterly without merit.

In his final two claims, Petitioner contends that counsel failed to properly investigate and present his case, including by failing to obtain and provide Petitioner with discovery and by failing to call either alibi witnesses or expert witnesses to support various aspects of his case. As this Court has explained,

> [i]n *Strickland*, the Supreme Court held that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. "The failure to investigate a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation," and "the failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *United States v. Travillion*, 759 F.3d 281, 293 n. 23 (3d Cir. 2014) (internal quotations omitted); *see also United States v Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (noting that a complete absence of investigation usually amounts to ineffective assistance because a counsel cannot be said to have made an informed, strategic decision not to investigate); *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir. 1980).
>
> Where a Petitioner can show that counsel's failure to investigate amounts to deficient performance, he must still show prejudice. In order to do so,

> a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make "a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produced a different result.
>
> *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987)); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("[w]hen a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced"); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome" of Petitioner's case); *accord Untied States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008).

*Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016).

Where a petitioner's claim of failure to investigate is based on counsel's failure to investigate or call a certain witness at trial, a showing of prejudice has an additional requirement – the provision of a sworn affidavit or testimony from the witness regarding the testimony the witness would have been provided had they been called at trial. *See Judge*, 119 F. Supp. 3d at 285; *see also Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001), *cert. denied*, 534 U.S. 919 (2001). Because a showing of *Strickland* prejudice "may not be based on mere speculation about what . . . witnesses . . . might have said," *Duncan*, 256 F.3d at 201-02 (quoting *Gray*, 878 F.2d at 712), a petitioner's failure to provide a sworn statement from the alleged witness is fatal to the petitioner's ability to make out a claim of prejudice based on the failure to call that witness. *Judge*, 119 F. Supp. 3d at 285; *Duncan*, 256 F.3d at 202.

Petitioner argues that counsel proved ineffective because he failed to identify and call alibi witnesses including someone named "Dee" who Petitioner does not otherwise identify and expert witnesses whom he contends could have aided in either convincing a jury that Petitioner's mental state was insufficient to support his aggravated assault convictions or that his cell phone information was improperly obtained.  The state PCR courts rejected these claims as Petitioner failed to provide any affidavit from either "Dee," any other alibi witness, or any expert who could purportedly have aided his case.  Petitioner's failure to provide any certification or other sworn statement from Dee or any proposed expert is fatal to any showing of prejudice based on the alleged failure to call these witnesses.  *Duncan*, 256 F.3d at 202.  Petitioner's contention that counsel was ineffective in failing to call Dee, other unidentified alibi witnesses, or an unspecified expert is therefore without merit.

In the remainder of his investigation related claim, Petitioner contends that counsel did not fully share discovery with him prior to his testifying at discovery, which he contends prevented him from providing "Dee's [phone] number" while he was on the stand.  As Petitioner fails to provide context for what information Dee could have provided insomuch as he utterly fails to provide a certification or other document regarding what testimony Dee could have provided, and as Petitioner otherwise fails to even attempt to show how the alleged insufficient review of discovery with him affected his trial, Petitioner has utterly failed to make a showing of prejudice.  Petitioner's discovery/investigation related ineffective assistance of counsel claim is therefore denied.

Petitioner's amended habeas petition (ECF No. 5) is denied.  Because Petitioner's claims are without merit, and because the appointment of counsel is only warranted in habeas matters where the Petitioner's claims are potentially meritorious, *see, e.g., Shelton v. Hollingsworth*, No.

15-1249, 2015 WL 2400780, at *2-3 (D.N.J. May 18, 2015), Petitioner's motion seeking the appointment of counsel (ECF No. 12) is denied.

## III.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's habeas claims are all without merit for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and his petition is not adequate to receive encouragement to proceed further.  This Court therefore denies Petitioner a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, Petitioner's amended petition for a writ of habeas corpus (ECF No. 5) is **DENIED**, Petitioner is **DENIED** a certificate of appealability, and Petitioner's motion seeking the appointment of counsel (ECF No. 12) is **DENIED**.  An appropriate order follows.

_s/Susan D. Wigenton_
Hon. Susan D. Wigenton,
United States District Judge

12